# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| REO ACQUISITION GROUP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 13-cv-1953 (KBJ) |
| | ) | |
| FEDERAL NATIONAL MORTGAGE ASSOCIATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

Plaintiff REO Acquisition Group ("REO") is a real estate company based in Lakeview Terrace, California that acquires, renovates, and resells residential properties. REO alleges that it entered into a contract with Defendant Federal National Mortgage Association ("Fannie Mae") to purchase a pool of foreclosed residential properties, and that it paid a $100,000 deposit as part of that transaction—a deposit that Fannie Mae retained when the transaction fell through following a disagreement over the financing terms. (Compl., ECF No. 1, ¶¶ 6, 14, 17.) REO's complaint seeks a declaration from this Court announcing that Fannie Mae breached the parties' agreement and also an order requiring Fannie Mae to return the deposit in full. (*See id.* at 6–7.)[1]

Before this Court at present is Fannie Mae's motion to dismiss REO's complaint. (Def.'s Mot. to Dismiss ("Def.'s Mot."), ECF No. 6.) Fannie Mae contends that REO has failed to state a claim for breach of contract, and that the terms of the parties'

---

[1] Page numbers throughout this memorandum opinion refer to those that the Court's electronic filing system assigns.

agreement allow Fannie Mae to keep REO's deposit.  (*See* Def.'s Mem. in Supp. of Def.'s Mot. ("Def.'s Br."), ECF No. 6-1, at 1–2.)  REO responds that Fannie Mae breached the agreement when it rejected REO's settlement funds on grounds not stated in the contract, and that Fannie Mae must therefore return REO's $100,000 deposit under the terms of the agreement.  (*See* Pl.'s Mem. in Opp'n to Def.'s Mot. ("Pl.'s Opp'n"), ECF No. 10, at 2, 9.)  In so arguing, both parties assume that an enforceable agreement between REO and Fannie Mae existed and that the instant dispute is over whether that contract was breached; however, this Court concludes that the parties never achieved an initial meeting of the minds with respect to certain material terms of the agreement, and thus, that there is no valid contract to enforce.  Accordingly, this Court will **DENY** Defendant's motion to dismiss, and will order the parties to submit supplemental briefing regarding the appropriate disposition of REO's $100,000 deposit. An order consistent with this memorandum opinion will follow.

## I.  BACKGROUND

### A.    Factual Background

REO's complaint alleges the following facts.  In November of 2010, REO submitted to Fannie Mae a formal offer to purchase a pool of thirty-five foreclosed homes, most of which were located in Arizona and California and all of which were owned by Fannie Mae.  (*See* Compl. ¶ 5.)  Prior to submitting this formal purchase proposal, REO had written to Fannie Mae's Pool Sale Transaction Manager, Deidre Rogers, to notify Fannie Mae that REO "intended to finance the project using a lender that would take back a mortgage on the acquired properties to secure its loan."  (*Id.* ¶ 13; *see also id.* ¶ 7.)  According to the complaint, REO sent this notification to Rogers in late September of 2010, and Rogers responded by e-mail on October 1, advising REO

that any lender "would be acceptable as long as they aligned themselves with the mission of Fannie Mae and accepted" certain resale restrictions to be included in the purchase agreement.  (*Id.* ¶ 13.)

REO sent Fannie Mae the proposed purchase agreement for the foreclosed properties on November 16, 2010, along with a $100,000 deposit toward the proposed purchase price.  (*Id.* ¶¶ 5, 6; *see also* REO Pool Sale Agreement ("Agreement"), Ex. 1 to Compl., ECF No. 1-3.)  Several provisions of the Agreement are relevant to the instant case.  For example, the Agreement specified that it would not take effect "unless and until" Fannie Mae delivered a fully executed copy of the Agreement to REO. (Agreement § 14(p)(i).)  The Agreement also stipulated that, after submitting the Agreement to Fannie Mae, REO would "not seek to modify" its terms until Fannie Mae returned a fully executed copy of the contract.  (*Id.* § 14(p)(ii).)

With respect to financing, the Agreement specifically provided that Fannie Mae would deliver a settlement statement to REO "identifying (i) the anticipated Closing Date, (ii) the schedule of Properties, (iii) the cost of title insurance to be paid by [Fannie Mae] . . . and (iv) all of the payments required to be made by [REO] to [Fannie Mae] at Closing[.]"  (*Id.* § 1; *see also id.* § 6(a).)  The Agreement also specified that, once REO received the settlement statement, REO would have no more than three business days to "execute and return the Settlement Statement to [Fannie Mae]" and to pay Fannie Mae or its escrow agent via "wire transfer of immediately available funds . . . the Purchase Price, the Closing Cost for each Property and all other amounts required to be paid by [REO] at Closing, as set forth on the Settlement Statement."  (*Id.* § 6(a).)  In other words, within three days of receiving the settlement statement from

Fannie Mae pursuant to the Agreement, REO would have to wire sufficient funds to cover all outstanding transaction costs to Fannie Mae.  The Agreement further stated that REO had provided "evidence satisfactory to [Fannie Mae] . . . of [REO's] ability to pay the Purchase Price at Closing[,]" and that REO's "obligation to purchase the [properties] is not subject to any financing or other contingency."  (*Id.* § 2(c).)  With respect to REO's $100,000 deposit, the Agreement provided that the deposit was "non-refundable" (*id.* § 2(b)) unless Fannie Mae breached the Agreement, in which case "the Deposit (less any escrow cancellation fees) [would] be returned" to REO (*id.* § 7(a).)

On December 8, 2010, Rogers "advised [REO] by e-mail that it had been awarded" the right to purchase the properties.  (Compl. ¶ 7.)  The e-mail did not include an executed copy of the Agreement.  (*See id.*; *see also id.* ¶¶ 9, 14.)  It did, however, include a settlement statement, which Rogers instructed REO to "sign and return" before "pay[ing] the balance of the purchase price into escrow within 72 hours, by December 13, 2010."  (*Id.* ¶ 7.)  Also on December 8th, REO President Paula Heiberg e-mailed Rogers telling her "that [REO] would execute and return the settlement statement that day[,]" and "request[ing] that Fannie Mae return a fully executed copy of the [Agreement] as soon as possible because [REO] needed a signed copy in order for its investors to provide the settlement funds."  (*Id.* ¶ 9.)

On December 9, 2010, REO's lender called Fannie Mae's escrow agent to discuss arrangements for wiring the settlement funds.  (*Id.* ¶ 10.)  At that point, Fannie Mae had not yet delivered a fully executed copy of the Agreement to REO.  (*See id.* ¶ 14.)  During the call, Fannie Mae's escrow agent told REO's lender that "Fannie Mae would not accept the funds because Fannie Mae would not allow a lender to be involved

in the transaction if it intended to take back a mortgage on the acquired properties in order to secure its loan." (*Id.* ¶ 10.) On December 10, 2010, REO and its lender called Rogers at Fannie Mae to discuss funding. (*Id.* ¶ 11.) Rogers confirmed what Fannie Mae's escrow agent had said the previous day, namely that "Fannie Mae would not allow [REO's] lender to be involved in the pool sale transaction if it intended to take back a mortgage on the acquired properties in order to secure the loan." (*Id.*) REO alleges that Fannie Mae's position "was a surprise" given the parties' prior communication about lenders in September and October of 2010. (*Id.* ¶ 13.) Nevertheless, over the course of the following week, from December 10th to 17th, REO sought unsuccessfully to obtain new financing that would satisfy Fannie Mae. (*Id.* ¶ 15.)

On December 15, 2010, while REO was still exploring financing options, Fannie Mae returned a fully executed copy of the Agreement. (*Id.* ¶ 14.) On December 17, 2010, Rogers e-mailed REO warning that REO's "failure to perform the terms of the Agreement" with respect to wiring timely settlement funds to Fannie Mae's account "could have significant adverse consequences." (*Id.* ¶ 16.) On December 21, 2010, "counsel for Fannie Mae advised [REO] in writing that it was in default of the Agreement because it had failed to deposit into escrow the funds required to settle the pool purchases" and that Fannie Mae was "elect[ing] to terminate the Agreement and to retain the $100,000 deposit that [REO] had paid." (*Id.* ¶ 17.)

## B.  Procedural History

On December 6, 2013, REO filed the instant complaint in federal court. The complaint alleges that Fannie Mae's refusal to accept funds from REO's lender was a breach of the parties' contract because "[t]he restriction on lender involvement . . . was

5

not a term or condition of the Agreement." (*Id.* ¶ 12; *see also id.* ¶ 25.)  REO further

contends that, once Fannie Mae defaulted, the Agreement required Fannie Mae "to

refund the deposit paid by REO" but that Fannie Mae "has failed and refused to do so"

thereby committing "a further breach of the agreement[.]" (*Id.* ¶ 26.)

On February 11, 2014, Fannie Mae filed a motion to dismiss REO's complaint

for failure to state a claim upon which relief can be granted pursuant to Federal Rule of

Civil Procedure 12(b)(6). (*See* Def.'s Mot. at 2.)  Fannie Mae asserts that the parties

entered into their Agreement on December 15, 2010—the date on which Fannie Mae

returned a fully executed copy of the Agreement to REO—and that, at that point, Fannie

Mae and its escrow agent had already "informed [REO] on December 9 and 10 that . . .

[REO] could not proceed with a lender that would take back a mortgage on the acquired

properties to secure its loan." (Def.'s Br. at 6.)  According to Fannie Mae, this

demonstrates that REO "full[y] underst[ood] . . . the restrictions on financing that were

being imposed by Fannie Mae in the contemplated transaction" at the time of

contracting. (*Id.* at 7.)  Thus, Fannie Mae maintains that it was REO that breached the

parties' Agreement when it failed to adhere to the agreed upon terms, and that Fannie

Mae is therefore entitled to retain REO's deposit. (*Id.* at 5 (citing Agreement § 7(b)).)

In response, REO directs this Court's attention to "[t]he [Agreement's] plain and

unambiguous language[,]" which REO contends "did not prohibit [it] from using

secured financing" to complete the transaction. (Pl.'s Opp'n at 2.)

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides that a party may move to

dismiss a complaint against it on the grounds that it "fail[s] to state a claim upon which

relief can be granted." Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion, a

complaint must comply with Rule 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). This requirement is meant to "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (alteration in original)).

"Although 'detailed factual allegations' are not necessary to withstand a Rule 12(b)(6) motion to dismiss for failure to state a claim, a plaintiff must furnish 'more than labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Busby v. Capital One, N.A.*, 932 F. Supp. 2d 114, 133 (D.D.C. 2013) (quoting *Twombly*, 550 U.S. at 555). In other words, the plaintiff must provide "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[M]ere conclusory statements" of misconduct are not enough to make out a cause of action against a defendant. *Id.* Rather, a complaint must contain sufficient factual allegations that, if true, "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

In considering a motion to dismiss, "[t]he court must view the complaint in a light most favorable to the plaintiff and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations." *Busby*, 932 F. Supp. 2d at 134. Although the Court must accept as true the facts in the complaint, it "need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint[,]" *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir.

1994), nor is the court "bound to accept as true a legal conclusion couched as a factual allegation[,]" *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

### III.    ANALYSIS

Both parties frame the instant dispute as an exercise in contract interpretation regarding payment terms.  (*See, e.g.*, Def.'s Br. at 5 ("The [Agreement] repeatedly demonstrates the parties' intention that the sale be accomplished by means of a quick and simple payment of cash without any contingencies or complications[.]"); Pl.'s Opp'n at 2 ("The plain and unambiguous language of the . . . Agreement did not prohibit REO from using secured financing to purchase the pool properties.").)  However, "whether an enforceable contract exists" in the first place "is a question of law[,]" and in this case, that question clearly precedes this Court's consideration of how the purported contract is best interpreted.  *Kramer Assocs., Inc. v. Ikam, Ltd.*, 888 A.2d 247, 251 (D.C. 2005) (quoting *Rosenthal v. Nat'l Produce Co.*, 573 A.2d 365, 369 n.9 (D.C.1990)).  Under the law of the District of Columbia, an enforceable contract requires both the "'*intention* of the parties to be bound'" and also "'*agreement* as to all material terms[.]'"  *Id.* (emphasis added) (quoting *Georgetown Entm't Corp. v. District of Columbia*, 496 A.2d 587, 590 (1985)).  Specifically, "there must be mutual assent of each party to all the essential terms of the contract."  *Malone v. Saxony Co-op. Apartments, Inc.*, 763 A.2d 725, 729 (D.C. 2000) ("This mutuality of assent is often referred to as a 'meeting of the minds.'").  And such essential terms include terms related to payment.  *See Queen v. Schultz*, 747 F.3d 879, 884 (D.C. Cir. 2014) (citing *Rosenthal*, 573 A.2d at 370).

This Court finds that the parties in the instant case never achieved "mutual assent" with respect to material financing terms, and thus that their Agreement is not an

enforceable contract under District of Columbia law.  *Malone*, 763 A.2d at 729.
Accepting the facts in the complaint as true, when REO submitted the proposed
Agreement to Fannie Mae, REO understood based on its prior communication with
Rogers that it would be allowed to finance the transaction using a lender that intended
to take back a mortgage on the properties as security.  (*See* Compl. ¶ 13.)  Fannie Mae
argues, and REO does not dispute, that by the time Fannie Mae signed and returned the
Agreement, Fannie Mae had already informed REO that such was not the case (*see*
Def.'s Br. at 1; Compl. ¶¶ 5–14), but it is well established in the District of Columbia
that purported acceptance of an offer does not create a valid contract if the accepting
party has altered the offer's material terms.  *Malone*, 763 A.2d at 728.  Instead, "a
statement purporting to accept an offer which contains a new material term operates as
a *counteroffer* and must be accepted by the original offeror in order to form a binding
contract."  *Id.* (emphasis added).

For example, in *Malone v. Saxony Co-op. Apartments, Inc.*, a tenant in an
apartment building offered to purchase the unit adjacent to his own in order to combine
the two units.  *Id.* at 728.  The property manager agreed to the sale on the condition that
the construction necessary to join the units be completed within 30 days; however,
because this 30-day restriction was a new, material term, the District of Columbia Court
of Appeals held that the property manager's purported acceptance was actually a
counteroffer that the tenant had to accept in order to form a binding contract.  *Id.*
Because the counteroffer was never accepted, the court concluded that no contract was
ever formed.  *Id.* at 730.

Similarly, in the instant case, Fannie Mae's introduction of a new restriction on the manner of financing constituted a change in the material terms of the Agreement. According to the complaint, Fannie Mae indicated to REO that REO's proposed financing terms would be acceptable in October of 2010, prior to REO's submission of the proposed Agreement, and it was not until December 9, 2010—more than three weeks *after* REO had submitted its offer to Fannie Mae—that Fannie Mae informed REO that it would not allow REO's lender to take back a mortgage on the properties, contrary to its previous communication.  (Compl. ¶¶ 10, 13.)[2]  Fannie Mae's introduction of this financing restriction occurred after REO had submitted the proposed Agreement and paid a nonrefundable deposit of $100,000, and also after REO had notified Fannie Mae that it would execute and return the settlement statements and pay the balance of the purchase price into escrow (*id.* ¶¶ 5–6, 9), and this Court has little doubt that Fannie Mae's financing restriction was a new material term of the proposed contract, just like the 30-day condition in *Malone*.  Therefore, just as in *Malone*, the introduction of this new financing term meant that Fannie Mae's purported acceptance—*i.e.,* its signing and returning the Agreement to REO—was a counteroffer rather than binding acceptance of REO's proposed Agreement.

The complaint's allegations also establish that REO never accepted Fannie Mae's counteroffer.  "'[A]cceptance of an offer is a manifestation of assent to the terms thereof made by the offeree in a manner invited or required by the offer.'"  *Toledano v.*

---

[2] The parties dispute the specific date on which REO actually submitted an executed (signed) copy of the proposed Agreement to Fannie Mae.  (*Compare* Pl.'s Opp'n at 3, n.2 ("[T]he Complaint, fairly construed, supports the inference that [REO] executed the Agreement in connection with the submission of its proposal to Fannie Mae in November 2010."), *with* Def.'s Br. at 2 (alleging that REO first submitted an executed copy of the Agreement to Fannie Mae on December 8, 2010).)  Either way, it is undisputed that REO's offer was made prior to the alleged December 9th and 10th conversations between REO and Fannie Mae regarding financing restrictions.

*O'Connor*, 501 F. Supp. 2d 127, 141 (D.D.C. 2007) (quoting Restatement (Second) of Contracts § 50(1)); *see also Malone*, 763 A.2d at 728 ("[T]o form a contract the offeree must convey to the offeror his acceptance of the offer.").  Under D.C. law, if the offer does not "explicitly direct[] a particular method of acceptance, the offer can be accepted in any reasonable manner[,]" *Vaulx v. Cumis Ins. Soc'y, Inc.*, 407 A.2d 262, 265 (D.C. 1979); however, acceptance generally must be clear and unequivocal.  *See, e.g.*, *Malone*, 763 A.2d at 728–29 (rejecting tenant's argument that the inquiries regarding the closing date that he made after the property manager introduced the 30-day condition sufficed to establish acceptance of the counteroffer, because the tenant's "conduct d[id] not in any way indicate his unequivocal assent" to the new restriction); *see also id.* at 730 (holding that the mutual assent required to form a binding contract was absent due to the tenant's failure to communicate sufficiently his agreement to the new material term).

Here, there is nothing in the complaint that indicates that REO expressed its unequivocal assent to the new financing term contained in Fannie Mae's counteroffer; indeed, REO's payment did not manifest this intention (REO had tendered the $100,000 deposit before the new term was introduced), and the complaint's allegations regarding REO's post-counteroffer efforts to "obtain financing for the pool purchase on terms that would satisfy the restrictions imposed by Fannie Mae" (Compl. ¶ 15) do not establish that REO unequivocally accepted Fannie Mae's new term.  *See* Williston on Contracts § 6:10 (4th ed. 2014) ("[T]he offeree's response, rather than signifying objectively an assent to the proposed bargain, instead may signify to a reasonable offeror that an acceptance is contemplated, but has yet to occur."); *see also id.* ("[A] reply to an offer

indicating that the offeree has attempted unsuccessfully to accept . . . does not meet the requirement of unequivocality, and no contract is thereby concluded."). Furthermore, "[i]t is not enough that the parties *think* that they have made a contract; they must have *expressed* their intentions in a manner that is capable of understanding." *Kramer Assocs.*, 888 A.2d at 253 (emphasis added) (quoting *Rosenthal*, 573 A.2d at 369–70). Finding no such expression in the allegations of REO's complaint, this Court concludes that REO did not assent to Fannie Mae's new financing restriction, and thus the parties never formed a binding contractual agreement.

## IV.    CONCLUSION

For the reasons set forth above, the complaint's allegations do not establish that REO and Fannie Mae formed an enforceable contract for the sale of the foreclosed homes.  Consequently, the parties' arguments regarding whether or not the contract was breached and by whom are beside the point, and Defendant's motion to dismiss will be **DENIED**.  The complaint's core contention that REO is entitled to a refund of its $100,000 deposit nevertheless remains.  *See, e.g.*, *Kramer Assocs.*, 888 A.2d at 253–55 (returning $75,000 deposit under equitable doctrine of unjust enrichment after finding that the parties had failed to form a binding contractual agreement).  Therefore, in light of this memorandum opinion and as set forth in the accompanying order, the parties here will be required to submit supplemental briefing on the appropriate remedy with respect to REO's deposit.

Date:  February 20, 2015

*Ketanji Brown Jackson*
KETANJI BROWN JACKSON
United States District Judge